## MATTER OF N–

### In Adjustment of Status Proceedings

*Designated by Commissioner September 26, 1988*

(1) A student who acquired reinstatement by fraud, by not revealing his unauthorized employment, did not obtain lawful status.

(2) Such student's situation is analogous to that of an alien in the United States illegally who departed and was subsequently admitted to the United States as a nonimmigrant. The Service has held that such alien, if he can demonstrate he re-entered to resume his unlawful residence, may qualify for legalization benefits.

(3) Acquisition of reinstatement by fraud renders an alien excludable pursuant to section 212(a)(19) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(19) (1982). A waiver of excludability is provided by 245A(d)(2)(B)(i) of the Act, 8 U.S.C. § 1255a(d)(2)(B)(i) (Supp. IV 1986), to assure family unity.

ON BEHALF OF APPLICANT:   Marie Westermeier
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001

This matter is an application for temporary resident status denied by the Director, Eastern Regional Processing Facility. The denial was appealed to the Legalization Appeals Unit ("LAU") which affirmed the denial. The proceedings were reopened by LAU pursuant to 8 C.F.R. § 103.5(b) (1988). The application will be granted.

The applicant is a married native and citizen of Nigeria. His parents, wife, two sons, six sisters, five brothers, and ex-wife are also natives and citizens of Nigeria. None of the relatives are applicants for temporary resident status. The applicant has one son and two daughters born in the United States, and two of his brothers and one sister are lawful permanent residents and reside in Washington, D.C.

The applicant was admitted to the United States as an "F-1" nonimmigrant student on December 13, 1980, with permission to remain until December 12, 1981. He enrolled at Southeastern University, Washington, D.C. The applicant's permission to remain in

the United States expired through the passage of time on December 12, 1981. During January 1982, he transferred to the University of the District of Columbia without the permission of the Service. On February 11, 1982, he requested the Immigration and Naturalization Service to grant him an extension of stay to remain in the United States as a student. *On March 5, 1982, his request was denied,* and he was granted until April 6, 1982, to leave the United States. The Service denied his request on the grounds that it was not timely filed and that the applicant had transferred schools without the Service's permission. The record shows the applicant was later reinstated to lawful student status with permission to remain until December 31, 1983. This was later changed to "duration of status." The applicant ultimately completed his studies by obtaining both Bachelor's and Master's degrees in Business Administration.

The Regional Processing Facility Director denied the application because the applicant failed to prove he had continued to reside in an unlawful status in the United States since before January 1, 1982. The period of time (subsequent to January 1, 1982, and before the time of his application for temporary resident status) during which he had been reinstated to student status was deemed to have broken his continuous unlawful residence. The regulations require that a nonimmigrant alien whose period of admission expired before January 1, 1982, must thereafter continuously reside in the United States in an unlawful status up to the time he files his application in order to be eligible for temporary resident status. 8 C.F.R. § 245a.2(b)(2) (1988).

On appeal, the applicant maintains, inter alia, that before, during, and after he successfully sought reinstatement to student status, he worked full-time without Service permission. The applicant has submitted credible evidence to establish this fact.

The question before us then is whether the applicant, who was reinstated to a nonimmigrant status subsequent to January 1, 1982, is eligible for temporary resident status on the grounds that his nonimmigrant status was reinstated by fraud and therefore he continued to reside in the United States in an unlawful status. For the following reasons we must conclude that the applicant is eligible for temporary resident status.

Section 245A(a)(2) of the Act, 8 U.S.C. § 1255a(a)(2) (Supp. IV 1986), generally requires that an alien must establish he has been in the United States in a continuous unlawful residence since January 1, 1982, in order to be eligible for temporary resident status. The statute, however, draws a distinction between aliens who en-

tered as nonimmigrants before January 1, 1982, and all other aliens.

An alien who entered as a nonimmigrant prior to January 1, 1982, must establish that his period of authorized stay expired before January 1, 1982, or that the alien's unlawful status was known to the Government as of January 1, 1982. Section 245A(a)(2)(B) of the Act. All other aliens, with the exception of nonimmigrant exchange aliens, must establish that they entered before January 1, 1982, and that they have resided continuously in the United States in an unlawful status since January 1, 1982. Section 245A(a)(2)(A) of the Act.

There is no dispute in this case that the applicant's status as a nonimmigrant student expired through the passage of time on December 12, 1981. Thus, on January 1, 1982, the applicant was residing in the United States in an unlawful status. Subsequently, the applicant applied for reinstatement of his student status. The Service granted the request.

We are also satisfied that, but for the applicant's misrepresentations when he applied for reinstatement of his student status, his request would have been denied because the applicant had been working off-campus without the authorization of the Service. 8 C.F.R. § 214.2(f)(12)(i)(D) (1988).

The Service has promulgated regulations that permit an alien to be eligible for temporary resident status notwithstanding the fact that the alien reentered the United States as a nonimmigrant subsequent to January 1, 1982. 53 Fed. Reg. 23,382 (1988) (to be codified at 8 C.F.R. § 245a.2(b)(9)). An alien who reentered as a nonimmigrant will have to establish that his return was to "an unrelinquished unlawful residence." *Id.*

Neither the statute nor the implementing regulations specifically address the issue raised in this case. However, because the Service is now permitting aliens who reentered as nonimmigrants to establish eligibility notwithstanding a "lawful" reentry, we can find no statutory basis that permits us to draw a distinction between nonimmigrant aliens who commit fraud at entry and those who commit fraud at the time of reinstatement to nonimmigrant status. In reaching this conclusion, we are also mindful that Congress intended the legalization program to be administered in a liberal and generous fashion. *Matter of C-*, 19 I&N Dec. 808 (Comm. 1988).

Accordingly, the alien who obtains reinstatement as a nonimmigrant subsequent to January 1, 1982, and who otherwise meets the continuous unlawful residence requirement, is eligible for temporary resident status if the reinstatement was obtained by the misrepresentation of material facts.

thority under 8 C.F.R. §3.1(c) (1988). A request the carrier has made for oral argument before this Board is denied as a matter of discretion. 8 C.F.R. § 3.1(e) (1988). The appeal will be sustained.

On December 21, 1984, the carrier brought 77 Cuban nationals to the United States from Madrid, Spain, and presented them for inspection as returning refugees who previously had been admitted to the United States for political asylum. All of the aliens presented the same refugee travel documents. The immigration officer who inspected them concluded that their travel documents were fraudulent. Consequently, they were detained for exclusion hearings before an immigration judge pursuant to section 235(b) of the Act, 8 U.S.C. § 1225(b) (1982).

Apparently, the Immigration and Naturalization Service was willing to detain only 26 of these aliens. In any event, the Service issued a Notice to Detain, Deport, Remove or Present Aliens (Form I-259), served it on the carrier, and returned the other 51 aliens to the custody of the carrier. The Form I-259 directed the carrier to present the 51 aliens at the Service office on December 26, 1984, for hearings before an immigration judge. Thirteen of the aliens absconded before they could be presented for exclusion hearings, and four more subsequently absconded on January 10, 1985.

On March 1, 1985, the district director issued a Notice of Intention to Fine under Immigration and Nationality Act (Form I-79) in which it was alleged that the carrier is liable for $17,000 in administrative fines under section 271(a) of the Act for failing to prevent 17 of the aliens from making unauthorized landings.

The carrier responded in a letter dated May 17, 1985. According to the carrier, it could not have ascertained through the exercise of reasonable diligence that the documents presented by the alien passengers were forgeries.[2] The carrier offered to return the aliens to Spain immediately despite pressing burdens caused by the demands of the holiday travel season, but the Service rejected the offer on the ground that political considerations precluded such removal to Spain. No indication was given by the Service with regard to a place at which the carrier could maintain custody over 51 aliens. The carrier accepted custody over the aliens, arranged for hotel accommodations, advised the hotel manager of the situation, and retained a professional security service to guard the group. The high holiday occupancy of hotels and the size of the group resulted in having to lodge the aliens on five different floors. Finally,

---

[2] This is the standard for remission of fines imposed under section 273 of the Act, 8 U.S.C. § 1323 (1982). Apparently, however, fines were not imposed under that section of the Act.

the wide media coverage of the arrival of these aliens resulted in an extraordinary number of people and reporters, in addition to friends and relatives of the aliens, congregating at their hotel. In view of these circumstances, the carrier contends that no fine should be imposed.

The record also contains an affidavit from one of the security guards, which was taken on December 26, 1984. He explains that there were only four guards to cover the five floors on which the aliens were located.

The district director found liability for 17 violations of section 271(a) of the Act. With regard to the 13 escapes that occurred sometime between December 22 and 26, he found that the unusual circumstances warranted mitigation in the amount of $300 for each of these violations. With regard to the four escapes that occurred on January 10, 1985, however, he found that mitigation was not warranted. According to the district director, the carrier should have tightened security by that time in view of the previous escapes. He concluded that the carrier had committed 17 violations of section 271(a) of the Act and imposed administrative fines totalling $13,800.

On appeal, the carrier contends, inter alia, that the Service should have provided detention facilities and security for the alien passengers involved in this case.

The pertinent part of section 271(a) of the Act reads as follows:

It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines . . . *other than transportation lines which may enter into a contract as provided in section 238*, bringing an alien to, or providing a means for an alien to come to, the United States . . . to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers. Any such person . . . who fails to comply with the foregoing requirements shall be liable to a penalty . . . of $1,000 for each such violation, which may, in the discretion of the Attorney General, be remitted or mitigated by him . . . . (Emphasis added.)

Section 238 of the Act, 8 U.S.C. § 1228 (1982), authorizes the Attorney General to enter into special contracts with transportation lines. Transportation lines that have executed such contracts are known as "signatory lines." The carrier in this case was a signatory line when the violation of section 271(a) of the Act allegedly occurred. 8 C.F.R. § 238.3(b) (1984).[3] The subject of the carrier's contract was the transportation of aliens through the United States in immediate and continuous transit. 8 C.F.R. § 238.3(a) (1984). The contract enabled the carrier to facilitate the transit of such passen-

---

[3] The carrier still is a signatory line. 8 C.F.R. § 238.3(b) (1988).

gers through the United States, principally by relieving them of documentary requirements that otherwise would have applied to them. Passengers covered by such agreements are known as "TRWOV" (transit without visa) aliens. In return for this benefit, the carrier agreed, inter alia, that it would not accept for passage any alien without a valid passport, a travel document authorizing his admission to the country of destination, and confirmed reservations through and beyond the United States. Moreover, the carrier agreed to hold the alien under guard while he is not aboard an aircraft in flight through the United States. We note further that the carrier agreed to the payment of a specified penalty for every violation of the contract. *See generally* 2 C. Gordon & H. Rosenfield, *Immigration Law and Procedure*, § 9.20 (rev. ed. 1988).

It does not necessarily follow that the carrier's signatory line status exempted it from fine liability under section 271(a) of the Act. The Cuban national passengers involved in this case were not TRWOV aliens. They were brought to the United States and presented for admission as returning refugees. Consequently, it is not apparent that any purpose would be served by allowing the carrier's signatory line status to exempt it from fine liability under section 271(a) of the Act with regard to these aliens. On the other hand, the terms of that section appear to exempt categorically all transportation lines which may enter into a contract as provided in section 238 of the Act. It is not necessary, however, to resolve that issue in this case. The carrier cannot be found in violation of section 271(a) of the Act in any event.

Upon arrival at Jamaica, New York, the carrier presented the alien passengers for inspection. If the carrier was exempt from fine liability under section 271(a) of the Act on the basis of its signatory line status, any penalty for the subsequent failure to maintain custody over the alien passengers would have to derive from the contract under section 238 of the Act. If, on the other hand, the carrier's signatory line status did not apply to this situation, the Service did not have authority to require the carrier to maintain custody over the aliens after the initial presentation of them for inspection.

Prior to an amendment of 8 C.F.R. § 235.3 (1982) by an interim rule which went into effect on July 9, 1982, more than 2 years before the events in question occurred, the Service had authority to require nonsignatory lines to maintain custody of alien passengers pending exclusion hearings. At that time, 8 C.F.R. § 235.3 (1982) read as follows:

(a) *Prior to inspection.* All persons arriving at a port in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival

by the master, commanding officer . . . or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service . . . .

(b) *Detention after inspection.* If in the opinion of examining immigration officer it is not practical to resolve a question of admissibility at the time of arrival of a passenger on a vessel or aircraft, the officer shall execute a Form I-259 to notify the agent for the vessel or aircraft . . . that the passenger is to be presented for further inspection.

The interim rule expanded these provisions to ensure that the detention practices of the Service would conform to statutory purposes and legislative intentions. *See* 47 Fed. Reg. 30,044, 30,046 (1982). It retained paragraph (a) of the former provisions and added the following new paragraphs:

(b) *Aliens with no documentation or false documentation.* Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents . . . or who arrives with documentation which appears to be false, altered, or otherwise invalid, . . . shall be detained in accordance with section 235(b) of the Act . . . .

(c) *Aliens with documents.* Any alien who appears to the inspecting officer to be inadmissible, but who does not fall within paragraph (b), may be detained, paroled, or paroled for deferred inspection by the inspecting officer. In determining whether or not a parole or a parole for deferred inspection is warranted the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

The interim rule also revised the paragraph that authorizes the practice in question to make it read as follows:

(d) *Carrier custody.* Any alien subject to detention under paragraph (b) or (c) of this section may be placed in the custody of the carrier *if the carrier has entered into a contract with the Attorney General under section 238 of the Act.* If in the opinion of the examining immigration officer it is not practical to resolve a question of admissibility at the time of arrival of a passenger on a vessel or aircraft, the officer shall execute Form I-259 to notify the agent for the vessel or aircraft . . . that the passenger is to be presented for further inspection. (Emphasis added.)

We construe these changes as a limitation on the employment of the practice in question to cases in which a carrier has entered into a contract under section 238 of the Act.[4] Consequently, if the carrier's status as a signatory line did not apply to the bringing of the aliens involved in this case, the Service did not have authority to require the carrier to maintain custody over them pending their exclusion hearings. It follows, therefore, that if the carrier was subject to section 271(a) of the Act, the carrier fulfilled its responsibilities under that section when it presented the aliens for inspection at the place of arrival.

---

[4] The final version revised paragraphs (b) and (c) of the interim rule in ways that have no bearing on the issue in this case. It became effective on November 18, 1982, and it remains in effect.

We conclude, therefore, that the Service has failed to establish that the carrier is liable for fines under section 271(a) of the Act.

Accordingly, the following orders will be entered.

**ORDER:** The appeal is sustained.

**FURTHER ORDER:** The fines imposed upon the carrier by the district director are cancelled, and these proceedings are terminated.